IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
AT JACKSON

| | | |
|---|---|---|
| TERRI L. BARGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:13-cv-1311 egb |
| | ) | |
| JACKSON, TENNESSEE HOSPITAL | ) | JURY DEMANDED |
| COMPANY, LLC, d/b/a REGIONAL | ) | |
| HOSPITAL OF JACKSON, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### I.  INTRODUCTION

Plaintiff Terri L. Barger ("Plaintiff") alleges Defendant Jackson, Tennessee Hospital Company, LLC, d/b/a Regional Hospital of Jackson ("Defendant" or the "Hospital"), interfered with her rights under the Family and Medical Leave Act ("FMLA").  Defendant moves for summary judgment because there is no genuine issue of material fact and Defendant is entitled to judgment as a matter of law.

Plaintiff's FMLA interference claim fails as a matter of law because she did not suffer from a serious health condition within the meaning of the FMLA.  Plaintiff had a wisdom tooth removed, and her dentist testified under oath that the procedure "went well" with no complications.  As numerous federal courts have held, under the FMLA's plain language, a tooth extraction without complications is routine dental work that does not qualify as a serious health condition.  In addition, Plaintiff did not suffer from a serious health condition because she was not incapacitated for more than three consecutive, full calendar days.

Second, Plaintiff's claim fails because she did not request FMLA leave and did not provide Defendant with sufficient information for Defendant to reasonably conclude Plaintiff had a serious health condition. Finally, Plaintiff's claim fails because Defendant terminated Plaintiff for legitimate reasons wholly unrelated to any alleged exercise of FMLA rights. Plaintiff scheduled a routine, elective wisdom tooth extraction on a day she was previously scheduled to work, thereby necessitating missing work in flagrant violation of her supervisor's prior written warning, and was a no-call, no-show two days later, which gave rise to immediate termination under Defendant's policies.

## II. STATEMENT OF FACTS

The Hospital hired Plaintiff as a registered nurse ("RN") in October 2010 in the Hospital's intensive care unit ("ICU"). (Defendant's Statement of Undisputed Material Facts ("SUMF") ¶ 1.) After her employment began, the Hospital granted Plaintiff's request to work on the weekends, and because of that, Plaintiff's regular work schedule was 7 p.m. Friday to 7 a.m. Saturday, 7 p.m. Saturday to 7 a.m. Sunday, and 7 p.m. Sunday to 7 a.m. Monday, and as needed. (SUMF ¶ 2.) Subsequently, again at Plaintiff's request, Plaintiff's regular schedule was expanded to generally also work Thursday from 7 p.m. to Friday at 7 a.m., in addition to working Friday 7 p.m. to Saturday at 7 a.m., Saturday at 7 p.m. to Sunday at 7 a.m., and Sunday at 7 p.m. to Monday at 7 a.m. (SUMF ¶ 3.)

On December 3, 2012, Plaintiff's supervisor, Lisa Wall, gave Plaintiff a written warning for excessive absences and explained that additional write-ups for "call ins" (*i.e.*, absences) could result in termination, and Plaintiff responded that she "would do better." (SUMF ¶ 4.) At the time of the written warning, Plaintiff understood that any further absences could result in the Hospital discharging her. (SUMF ¶ 5.)

On November 5, 2012, Peter McLemore, DDS, personally examined Plaintiff for the first time. (SUMF ¶ 6.) Among other diagnoses, Dr. McLemore recommended that a wisdom tooth be extracted. (SUMF ¶ 7.) Although Dr. McLemore recommended Plaintiff have the tooth extracted, the removal of the wisdom tooth "was not an emergency" in his opinion. (SUMF ¶ 8.)

Plaintiff scheduled the appointment to have her wisdom tooth extracted for Thursday, January 3, 2013 at 9:50 a.m. (SUMF ¶ 9.) In January 2013, Dr. McLemore's office worked alternating weeks: the first week, his office was open Monday, from 8 a.m. to 7 p.m., Tuesday 7 a.m. to 6 p.m., and Wednesday 7 a.m. to 5 p.m.; the alternate week his office was open Tuesday from 7 a.m. to 6 p.m., Wednesday 7 a.m. to 5 p.m., and Thursday 8 a.m. to 7 p.m. (SUMF ¶ 10.) Dr. McLemore's office scheduled tooth extractions every day it was open in the January 2013 time frame, and an appointment for a tooth extraction could be scheduled at the first available opening, which could be that same day or at most two weeks later. (SUMF ¶ 11.)

After being notified that Dr. McLemore was available on Thursday, January 3, 2013 for a wisdom tooth extraction, Plaintiff did not ask if Dr. McLemore had any appointments available on other dates when she was <u>not</u> scheduled to work. (SUMF ¶ 12.)

Before Dr. McLemore extracts wisdom teeth, his typical practice is to educate patients about the procedure during the patient's initial appointment when the need for a wisdom tooth extraction is diagnosed. (SUMF ¶ 13.) When Dr. McLemore explains the procedure for a wisdom tooth extraction, "as a rule" he advises patients that there is a possibility they will not be able to work the day of the procedure and that they need to plan on taking the day off, or potentially more time off than that. (SUMF ¶ 14.) Dr. McLemore has no reason to believe he did not follow his normal procedure with respect to advising Plaintiff regarding her wisdom tooth extraction. (SUMF ¶ 15.)

Plaintiff drove herself to Dr. McLemore's office for the procedure on January 3, 2013, no one went with her, and she did not meet anyone there.  (SUMF ¶ 16.)  Before the procedure was conducted on January 3, 2013, Plaintiff signed a document entitled "CONSENT FORM – TOOTH EXTRACTION," which documented, among other items, that Plaintiff knew there were "complications with the surgery and the medications," and that the "more common complications include pain, swelling, bleeding, dry socket, limited mouth opening, infection, bruising and discoloration of the skin, temporary numbness and tingling of the lip, tongue, chin, gums, cheek or teeth."  (SUMF ¶ 17.)  The CONSENT FORM – TOOTH EXTRACTION further documented that medications given during or after the surgery "may cause drowsiness and a lack of awareness and coordination" and that Plaintiff had "been advised not to operate any vehicle or hazardous device while taking such medications for at least 24 hours or until recovered from their effects."  (SUMF ¶ 18.)

During the wisdom tooth procedure on January 3, 2013, Dr. McLemore gave Plaintiff anesthesia, which was usual, as well as nitrous oxide, which was also common to use, and the procedure went well.  (SUMF ¶ 19.)  The roots of Plaintiff's tooth fractured during the extraction, but Dr. McLemore did not consider that a complication because it happens "really frequently." (SUMF ¶ 20.)   After the procedure, Dr. McLemore prescribed Lortab, 7.5 milligrams, to Plaintiff; that prescription and the amount is typical to provide to a patient after a wisdom tooth extraction.  (SUMF ¶ 21.)  When Dr. McLemore prescribes Lortab, he will typically discuss with a patient that it can make the patient drowsy, that the patient does not need to operate heavy equipment, and that the patient should generally take it easy by going home and resting.  Dr. McLemore has no reason to believe he did not explain this to Plaintiff, consistent with his normal procedure.  (SUMF ¶ 22.)  Dr. McLemore provided Plaintiff with a note excusing her from work on January 3, 2013 and told Plaintiff after completing the procedure that she would

not be able to go to work because of the bleeding and the pain she would experience once the medication wore off.  (SUMF ¶ 23.)

After the procedure, Plaintiff drove to the pharmacy to get her prescription Lortab, and then drove home by herself.  (SUMF ¶ 24.)  While she was waiting for her prescription to be filled, Plaintiff called Ms. Wall, her supervisor, and informed Ms. Wall that the dentist "got into more than what they thought they would when they were doing my tooth and that I would not be able to come to work" on Thursday, January 3, 2013.  Plaintiff also informed Ms. Wall she had a doctor's note, but she did not provide it to Ms. Wall at that time.  (SUMF ¶ 25.)  After receiving the call, Ms. Wall was very upset because Plaintiff had scheduled an elective procedure on a day when Plaintiff was scheduled to work, just one month after Ms. Wall had given Plaintiff a written warning for excessive absenteeism and advised Plaintiff that any further absence could result in termination.  (SUMF ¶ 26.)

Plaintiff called Ms. Wall on Friday, January 4, 2013 and told Ms. Wall that her mouth was bleeding every time she stood up, she may have to see her dentist, and she could not work that night.  (SUMF ¶ 27.)  Ms. Wall informed Plaintiff on Friday, January 4 that if she needed to call in sick on Saturday, January 5, 2013, she needed to call the Hospital's house supervisor because Ms. Wall would not be at work on Saturday, January 5.  (SUMF ¶ 28.)

On Saturday, January 5, 2013, Plaintiff was supposed to be present for her 7 p.m. shift by 6:45 p.m., but Plaintiff was not present and had not called the house supervisor to request another sick day in advance of her shift.  (SUMF ¶ 29.)  During the night of Saturday, January 5, 2013 and possibly the early morning hours of Sunday, January 6, 2013, Hospital representatives were informed through telephone conversations that Plaintiff was home, had "slurred speech" that was difficult to understand, and was "pretty out of it."  (SUMF ¶ 30.)  Plaintiff did not come to work on Sunday, January 6, 2013.  (SUMF ¶ 31.)

On Sunday, January 6, 2013, Plaintiff's friend, Darrell Green, accidentally called Ms. Wall. When Ms. Wall spoke with him, he told Ms. Wall that Plaintiff was "pretty sleepy" and he thought Plaintiff "had just taken some medicine and not eaten," so he was going to give Plaintiff some food "to see if it would perk her up." (SUMF ¶ 32.) Ms. Wall asked Mr. Green if Plaintiff needed to go to the emergency room, and Mr. Green said Plaintiff did not. Ms. Wall told Mr. Green that if he needed anything to call her, but Mr. Green never did. Plaintiff did not call Ms. Wall on Sunday, January 6. (SUMF ¶ 33.)

On Monday, January 7, 2013, Plaintiff woke up sometime after 5 a.m., called Ms. Wall, and she and Ms. Wall arranged a meeting that morning at about 9 a.m. (SUMF ¶ 34.) While at the Hospital that Monday morning, Plaintiff called Dr. McLemore and handed the telephone to Ms. Wall. Dr. McLemore spoke with Ms. Wall about Plaintiff having a tooth pulled and said she would likely have needed to take off work post procedure, but he did not verbalize a time period for which Plaintiff would need to take off work. (SUMF ¶ 35.) That same morning, on January 7, 2013, Plaintiff gave Ms. Wall a note from Dr. McLemore requesting that Plaintiff be excused from work on January 3, 2013. The note did not mention January 4, 5, or 6. (SUMF ¶ 36.)

On Wednesday, January 9, 2013, Plaintiff met with Ms. Wall and Barb Euler, the Hospital's Human Resources Director. Ms. Wall and Ms. Euler discharged Plaintiff for scheduling an elective, non-emergency procedure on a day that Plaintiff was scheduled to work (*i.e.*, Thursday, January 3, 2013), which led to Plaintiff exceeding the number of absences allowed by the Hospital in a 12-month period, after Plaintiff had been warned that another absence could result in her termination, and for being a no call/no show on Saturday, January 5, 2013. (SUMF ¶ 37.) During the termination meeting, FMLA leave was not discussed and Plaintiff never asked for the posted telephone number to make an FMLA request. (SUMF ¶ 38.)

After being terminated, Plaintiff called Dr. McLemore's office and requested another "work excuse" note from Dr. McLemore for the Friday-Sunday (January 4-6) shifts she had missed. (SUMF ¶ 39.) Plaintiff's friend, Darrell Green, picked up a note from Dr. McLemore's office and faxed it to the Hospital. The notation at the top of the faxed letter shows that it was faxed to the Hospital on January 14, 2013, five days after Plaintiff's termination, and the note excused Plaintiff from work "until" January 7, 2013. (SUMF ¶ 40.) Since January 3, 2013, Plaintiff has not returned to be examined or treated by Dr. McLemore. (SUMF ¶ 41.) Plaintiff never requested to take FMLA leave during her employment with the Hospital. (SUMF ¶ 42.)

## III. STANDARD OF REVIEW

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate when defendant demonstrates that plaintiff is unable to produce evidence supporting the essential elements of her case. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). Such is the case here.

## IV. ARGUMENT

To establish a *prima facie* case of FMLA interference, Plaintiff must show (1) she is an eligible employee under the FMLA; (2) Defendant is a covered employer under the FMLA; (3) Plaintiff was entitled to leave under the FMLA; (4) Plaintiff gave Defendant notice of her intention to take leave; and (5) Defendant denied Plaintiff FMLA benefits to which she was entitled.[1] *Saulter v. Detroit Area Agency on Aging*, 562 F. App'x 346, 362-63 (6th Cir. 2014).

---

[1] Defendant does not dispute elements one and two.

As explained below, Plaintiff's FMLA interference claim fails because she did not have a serious health condition and thus was not entitled to FMLA leave, she did not provide Defendant with sufficient notice of her intention to take FMLA leave, and Defendant had legitimate reasons to discharge her unrelated to any alleged exercise of FMLA rights.

## A.    Plaintiff Did Not Have a Serious Health Condition

"A plaintiff cannot establish a prima facie case of FMLA interference without demonstrating that she suffered from a 'serious health condition.'" *Taylor v. Autozoners, LLC*, 706 F. Supp. 2d 843, 848 (W.D. Tenn. 2010).  Indeed, the FMLA's "legislative history makes clear that Congress intended the FMLA to cover serious illnesses that last more than a few days." *Brannon v. Oshkosh B'Gosh, Inc.*, 897 F. Supp. 1028, 1035 (M.D. Tenn. 1995).  According to the FMLA's legislative history, "[t]he term 'serious health condition' is not intended to cover short-term conditions for which treatment and recovery are very brief." *Id.* (quoting S. Rep. No. 3, 103d Cong., 1st Sess. 1993, 1993 U.S.C.C.A.N. 3, at 26-27).  "Conditions or medical procedures that would not normally be covered by the legislation include minor illnesses which last only a few days and surgical procedures which typically do not involve hospitalization and require only a brief recovery period." *Id.* (internal quotation omitted).

To that end, the FMLA defines a "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).  The Department of Labor's regulations concerning the FMLA explain what qualifies as a serious health condition.  29 C.F.R. §§ 825.113 – 825.115.  "Whether an illness qualifies as a serious health condition under the FMLA is a legal question which the court must determine." *Autozoners,* 706 F. Supp. 2d at 849 (quoting *Alston v. Sofa Express, Inc.*, No. 2:06-cv-0491, 2007 WL 3071662, at *8 (S.D. Ohio Oct. 19, 2007)).  A plaintiff may not

avoid this legal question of whether she suffered from a serious health condition "simply by alleging it to be so." *Bond v. Abbott Labs.*, 7 F. Supp. 2d 967, 974 (N.D. Ohio 1998) (internal citations omitted).

        1.        <u>The Routine Dental Procedure Plaintiff Underwent Is Not a Serious Health Condition Under the FMLA's Plain Language</u>

The FMLA's regulations specifically address dental work in the context of what constitutes a "serious health condition." Under the FMLA's "serious health condition" regulation, the term "treatment does not include routine physical examinations, eye examinations, or dental examinations." 29 C.F.R. § 825.113(c). In addition, the regulation states that "[o]rdinarily, unless complications arise, . . . <u>routine dental or orthodontia problems</u>, periodontal disease, etc., <u>are examples of conditions that do not meet the definition of a serious health condition and do not qualify for FMLA leave</u>." *Id.* § 825.113(d) (emphasis added).

"Cases which have addressed leave for dental care have generally followed this regulation, finding that leave arising from routine dental care is not a serious health condition, even where some degree of pain is associated with the condition." *Brooks v. Via Christi Reg. Med. Ctr., Inc.*, No. 08-1376-JTM, 2010 U.S. Dist. LEXIS 9847, at *24-26 (D. Kan. Feb. 4, 2010) (copy attached as <u>Exhibit D</u>) (listing several cases holding routine dental problems do not constitute serious health conditions). For example, in *Bond*, Bond missed work because he had three teeth extracted, and his employer did not excuse this absence. 7 Supp. 2d at 971. Bond claimed that his teeth extractions qualified as a serious health condition because his condition was a "'complication' of routine dental or orthodontia problems." *Id.* at 974. The court rejected this contention and held that Bond did not suffer from a serious health condition because, in his deposition, Bond's dentist testified that the extractions were "routine" and without complication, despite the fact that the extractions were "emergency treatment." *Id.* at 974-75.

In other analogous cases, federal district courts have consistently held that a tooth extraction is a routine dental procedure, even when it requires missing multiple days of work thereafter. *See Ducharme v. Cape Indus., Inc.*, No. 01-74503, 2002 U.S. Dist. LEXIS 21926, at *2, 5 (E.D. Mich. Oct. 8, 2002) (copy attached as <u>Exhibit E</u>) (holding, in case where plaintiff had tooth extraction and then missed four days of work, that plaintiff "had failed to show that his tooth extraction constituted anything more than a 'routine dental or orthodontia problem'" and thus FMLA did not apply); *Brown v. Seven Seventeen HB Philadelphia Corp.*, No. 01-1741, 2002 U.S. Dist. LEXIS 15066, at *14 (E.D. Pa. Aug. 8, 2002) (copy attached as <u>Exhibit F</u>) (holding that plaintiff's tooth extraction "does not meet the level of seriousness implicated by the examples given in the regulations," even though plaintiff's tooth had an infection that would have spread if not treated and was treated by antibiotics and an anti-inflammatory); *Brooks*, 2010 U.S. Dist. LEXIS 9847, at *26 (holding that plaintiff's "subjective assessment" of incapacitation coupled with dentist's subsequent statement that it was not "unreasonable" for plaintiff to stay off work was insufficient to show that routine dental care qualified as a serious health condition).

The same result should occur here. The facts of this case are even stronger for Defendant than the facts in *Bond* were for Abbott Laboratories. In this case, unlike in *Bond*, Plaintiff's wisdom tooth extraction was an elective, non-emergency procedure. (Dep. of Peter McLemore, DDS ("McLemore Dep.") 17.) Further, Dr. McLemore, Plaintiff's dentist, testified under oath that the procedure "went well" and there were no complications:

> Q. Okay. How did the procedure go?
>
> A. **It went - - it went well**.
>
> Q. Okay. Were there any complications?
>
> A. **Well, the - - the tooth, the - - one of the roots fractured during the extraction, which is - - I wouldn't call that a complication, it happens really frequently**. Ideally, you

> know, you would like to remove the tooth all in one piece,
> but sometimes that doesn't happen.

(McLemore Dep. 30:22 – 31:6) (emphasis added). Dr. McLemore further testified that the fact one of the roots fractured did not change anything regarding the procedure or the required amount of anesthesia. (McLemore Dep. 31:12-16.) Plaintiff has never returned to see Dr. McLemore after the day of the procedure. (Pl. Dep. 81; McLemore Dep. 36.)

As in *Bond*, the undisputed facts here show that the wisdom tooth extraction was a "routine dental or orthodontia problem" that did not present complications and thus does not qualify as a serious health condition under the plain language of the controlling FMLA regulation, 29 C.F.R. § 825.113. Furthermore, as cases like *Ducharme* and *Brown* show, the fact that Plaintiff experienced pain and took prescription medication after the procedure does not change the fact that the tooth extraction was a routine procedure that went well, without complication. Such procedures are not covered by the FMLA, as numerous courts have held.

2. <u>Plaintiff Was Not Incapacitated for the Requisite Time to Constitute a Serious Health Condition</u>

Even if the Court found, contrary to caselaw and the controlling regulation, that the extraction was not routine dental work, Plaintiff cannot establish a serious health condition because she was not incapacitated for more than three consecutive, full calendar days. Plaintiff did not receive inpatient care in a hospital, hospice, or residential medical care facility, and therefore cannot meet the first avenue of proving an FMLA serious health condition. 29 U.S.C. § 2611(11)(A). Plaintiff's only recourse, then, is to attempt to prove that she received "continuing treatment by a healthcare provider." *Id.* § 2611(11)(B). The FMLA's regulations provide various ways an individual can receive "continuing treatment by a health care provider." 29 C.F.R. § 825.115. The only method Plaintiff alleges is described in subsection (a) of §

825.115 (Compl. ¶ 18), which requires, *inter alia*, "[a] period of incapacity of <u>more than three consecutive, full calendar days</u>." *Id.* § 825.115(a) (emphasis added).

This Court and other district courts within the Sixth Circuit consistently, and correctly, interpret "<u>more than</u> three consecutive, full calendar days" as requiring <u>four consecutive, full calendar days of incapacity</u> to meet this threshold requirement for a serious health condition. *Autozoners,* 706 F. Supp. 2d at 850 ("Generally, then, a plaintiff must come forward with some evidence that a health care provider has instructed, recommended, or at minimum authorized an employee not to work <u>for at least four consecutive days</u> for that employee to be considered incapacitated for the required period of time under the FMLA.") (quoting *Helmick v. Solid Waste Auth. of Cent. Ohio*, No. 2:07-CV-912, 2009 WL 650417, at *6 (S.D. Ohio Mar. 10, 2009)) (emphasis added); *Bond*, 7 F. Supp. 2d at 974 (same); *Alston*, 2007 WL 3071662, at *8 (same); *Fritz v. Phillips Serv. Indus., Inc.*, 555 F. Supp. 2d 820, 832 (E.D. Mich. 2008) ("To satisfy this regulation, plaintiff must first demonstrate a period of incapacity (i.e., the inability to work) for at least four consecutive days.") (quoting *Murray v. Red Kap Indus., Inc.*, 124 F.3d 695, 698 (5th Cir. 1997)); *Combs v. Quest Specialty Coating LLC*, 12-10995, 2013 U.S. Dist. LEXIS 52591, at *6 (E.D. Mich. April 12, 2013) (copy attached as <u>Exhibit G</u>) (same).

In this case, Plaintiff cannot demonstrate that she was incapacitated for four consecutive, full calendar days. Assuming *arguendo* that Plaintiff was incapacitated on Friday, January 4, Saturday, January 5, and Sunday, January 6, 2013, Plaintiff cannot show that she was incapacitated for a full day on Thursday, January 3, 2013 so as to meet the four-day threshold. That day, Plaintiff, in fine health, drove herself to her 9:50 a.m. dental appointment. (Pl. Dep. 42.) She did not arrange for anyone to meet her or drive her home after the appointment. (Pl. Dep. 42, 46-47.) Therefore, Plaintiff was not incapacitated for the full day on Thursday, January 3, 2013, which means that Thursday cannot serve as the fourth day of incapacity.

The only other potential fourth day of incapacity would be Monday, January 7, 2013, but Plaintiff was not incapacitated for any portion of this day, much less the required full day. On January 7, Plaintiff woke up at about 5:30 a.m., called her supervisor, Lisa Wall, went and met with Ms. Wall at the Hospital, and arranged for Ms. Wall to speak with Dr. McLemore. (Pl. Dep. 69-74.) Further, the second note from Dr. McLemore that Plaintiff provided on January 14, 2013 (five days after her termination) only excused Plaintiff from work "until" January 7, 2013, which means Plaintiff could in fact work on January 7, 2013 if she had been scheduled (which she was not). (Pl. Dep. 80, Ex. 3.) As this Court has observed, "[i]n this Circuit, it appears that 'incapacity' means 'unable to work.'" *Autozoners,* 706 F. Supp. 2d at 851 (internal citations omitted); *see also* 29 C.F.R. § 825.113(b). Plaintiff could have worked on January 7, 2013. As a result, January 7, 2013 cannot serve as the fourth day of incapacity.

Accordingly, because Plaintiff was not incapacitated for four consecutive full calendar days, she cannot show that she experienced incapacity for the required period of time. As a result, summary judgment must be granted to Defendant. *Bond*, 7 F. Supp. at 973 ("If a plaintiff cannot show that he or she had a condition that incapacitated him or her, 'the Court's inquiry is over and summary judgment is appropriate.'").

### B. Plaintiff Failed To Give Defendant Proper Notice

In addition to not having a serious health condition, Plaintiff failed to provide the Hospital with notice of her intention to take FMLA leave. As the Sixth Circuit has observed, "[n]othing in the statute places a duty on an employer to affirmatively grant leave without such a request or notice by the employee." *See Brohm v. JH Props., Inc.*, 149 F.3d 517, 523 (6th Cir. 1998). "Rather, to invoke the protection of the FMLA, <u>an employee must provide notice and a qualifying reason for requesting the leave</u>." *Id.* (emphasis added). The Sixth Circuit has "recognized that an employee gives his employer sufficient notice that he is requesting leave for

an FMLA-qualifying condition when he gives the employer enough information for the employer to reasonably conclude that an event described in FMLA § [2612](a)(1) has occurred."  *See Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 451 (6th Cir. 1999).  "In addition, part of reasonable notice generally includes an indication of 'the anticipated timing and duration of the leave.'"  *Wallace v. FedEx Corp.*, 764 F.3d 571, 586 (6th Cir. 2014).

In this case, Plaintiff did not request FMLA leave (as Plaintiff admitted on p. 82 of her deposition) or provide the Hospital with sufficient information for it to reasonably conclude that Plaintiff was suffering from a serious health condition, as the following timeline demonstrates.

### 1.     Thursday, January 3, 2013

After her extraction, Plaintiff called Ms. Wall and told her that "they had got into more than what they thought they would when they were doing my tooth and that [she] would not be able to come to work tonight."  (Pl. Dep. 48-49.)  Plaintiff also told Ms. Wall that she had a doctor's note, but did not provide it to Ms. Wall at that time.  (Pl. Dep. 48, 74.)  This information was insufficient to put Defendant on notice that Plaintiff had a serious health condition because she was not receiving inpatient care, was not experiencing a chronic condition, and had not been incapacitated for four consecutive, full calendar days.  29 C.F.R. §§ 825.113-115.

### 2.     Friday, January 4, 2013

This day, Plaintiff "called in sick" to Ms. Wall and told Ms. Wall that her mouth was bleeding every time she stood up, she may have to see her dentist, and she could not work that night.  (Wall Dep. 17-18.)  Again, this information was not sufficient for the Hospital to reasonably conclude that Plaintiff was suffering from a serious health condition because Plaintiff had undergone a routine tooth extraction from which mouth bleeding typically occurs, was not receiving inpatient care, and had not been incapacitated for four consecutive, full calendar days. 29 C.F.R. §§ 825.113-115; McLemore Dep. 22-24, Ex. 1 (DEF 0399).

- 14 -

### 3. Saturday, January 5, 2013

Before her scheduled shift, Plaintiff did not call the Hospital's house supervisor to inform the Hospital that she would not be able to work, contrary to Hospital policy and Ms. Wall's specific instructions. (Wall Dep. 18, 21-23.) During the night of Saturday, January 5, 2013 and possibly the early morning hours of Sunday, January 6, 2013, Hospital representatives were informed through telephone conversations that Plaintiff was home, had "slurred speech" that was difficult to understand, and was "pretty out of it." (Wall Dep. 26-27, 31-32.) This information was not sufficient for the Hospital to reasonably conclude that Plaintiff was suffering from a serious health condition because Plaintiff was not receiving inpatient care and had not been incapacitated for four consecutive, full calendar days. 29 C.F.R. §§ 825.113-115.

### 4. Sunday, January 6, 2013

The only relevant communication this day occurred when Plaintiff's friend, Darrell Green, accidentally called Ms. Wall. (Wall Dep. 33-34.) Mr. Green told Ms. Wall that Plaintiff was "pretty sleepy" and he thought Plaintiff "had just taken some medicine and not eaten," so he was going to give her some food to "see if it would perk her up." (Wall Dep. 34.) Ms. Wall asked Mr. Green if Plaintiff needed to go to the emergency room, and Mr. Green said she did not. (Wall Dep. 33-35.) Ms. Wall told Mr. Green that if he needed anything to call her, but neither he nor Plaintiff did. (*Id.*)

The information conveyed here was not sufficient for the Hospital to reasonably conclude that Plaintiff was suffering from a serious health condition. The Hospital was affirmatively told Plaintiff did not need inpatient care, Plaintiff had not been incapacitated for four consecutive, full calendar days, and the information Defendant received was only that Plaintiff was "pretty sleepy" and needed food to "perk her up."

### 5. Monday, January 7, 2013

On this date, Ms. Wall spoke with Dr. McLemore when Plaintiff handed her telephone to Ms. Wall. Dr. McLemore confirmed to Ms. Wall that Plaintiff had "dental surgery on 1/3/13 for which she would likely have needed to take off work post procedure," but there is no evidence Dr. McLemore verbalized a time period that Plaintiff would need to be off. (Wall Dep. 37-38, Ex. 1; McLemore Dep. 41.) In fact, Plaintiff provided Ms. Wall a note from Dr. McLemore on January 7 specifically excusing Plaintiff from work for only January 3, 2013. (Pl. Dep. 74, Ex. 3.) Other than stating Plaintiff had "dental surgery on January 3, 2013," the note did not provide any additional information regarding Plaintiff's medical condition.

The information provided by Plaintiff and Dr. McLemore was not enough for the Hospital to reasonably conclude that Plaintiff had a serious health condition. On the contrary, Dr. McLemore's note only excused Plaintiff from work for one day (Thursday, January 3, 2013), and the note identified no other medical conditions other than the fact that Plaintiff had dental surgery (which Ms. Wall already knew). The only medical evidence Plaintiff provided was a doctor's note that indicated she could not work on Thursday, January 3, which is obviously not enough to show incapacity for four consecutive, full calendar days. 29 C.F.R. § 825.115(a).

6.      <u>Tuesday, January 8, 2013</u>

The Hospital was provided with no additional information regarding Plaintiff.

7.      <u>Wednesday, January 9, 2013</u>

During the termination meeting on this day, FMLA leave was not discussed and Plaintiff never asked for the posted telephone number to make an FMLA request. (Wall Dep. 58-59.) After the meeting, Plaintiff says she called Dr. McLemore's office to request another work note for the remaining days she had missed. (Pl. Dep. 78-79.)

8.      <u>Monday, January 14, 2013</u>

Mr. Green apparently picked up a note from Dr. McLemore's office on this day and faxed it to Defendant.  (Pl. Dep. 79, Ex. 3.)  The fax indicates it was sent on January 14, 2013, five days after Plaintiff's termination.  This note, like Dr. McLemore's previous note, does not identify a serious health condition or even an impairment.  Rather, this note only states that Plaintiff "was seen at our office for treatment for dental services" and that "this procedure required Ms. Barger to be off work until January 7, 2013."  (Pl. Dep. Ex. 3.) (emphasis added)

This note from Dr. McLemore's office did not provide Defendant with sufficient information for it to reasonably conclude Plaintiff had a serious health condition because it only states that she underwent "treatment for dental services;" it mentions no complications.  (*Id.*)  As shown above, routine dental work without complications does not give rise to a serious health condition under the FMLA.  29 C.F.R. § 825.113(d).  Moreover, the note did not support a period of incapacity of four consecutive, full calendar days, because it provided that Plaintiff could return to work on Monday, January 7, 2013.  In addition, this doctor's note – submitted five days after Plaintiff's termination – was not timely because Plaintiff did not provide this notice "as soon as practicable."  29 C.F.R. § 825.303(a).  Rather, Plaintiff let an entire week pass following her January 7 meeting with Ms. Wall, and five days pass following her termination on January 9, before submitting this note.

In sum, Plaintiff did not provide the Hospital with sufficient information for the Hospital to reasonably conclude that Plaintiff was suffering from a serious health condition and thus entitled to FMLA leave.  Plaintiff's FMLA interference claim fails for this reason as well.

## C. Defendant Discharged Plaintiff for Legitimate Reasons Unrelated to Any FMLA Rights Plaintiff Allegedly Possessed

The Sixth Circuit has recognized that the FMLA "establish[es] that interference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason

unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *See Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006).

Under the FMLA regulations, "[w]hen the need for leave is not foreseeable, an employee must comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances." 29 C.F.R. § 825.303(c); *see, e.g., Short v. Hartford Baker, Inc.*, 3:10-cv-46-RLY-WGH, 2012 U.S. Dist. LEXIS 10481, at *9-13 (S.D. Ind. Jan. 30, 2012) (copy attached as <u>Exhibit H</u>) (upholding termination of employee who was eligible for FMLA leave but did not comply with employer's call-in policy).

In this case, Plaintiff was terminated in part because she was a no-call, no-show on Saturday, January 5, 2013 and did not contact the house supervisor before her scheduled shift despite being instructed to do so by Ms. Wall. (Wall Dep. 18.) As Ms. Wall explained in her deposition, any no-call, no-show gives rise to immediate termination. (Wall Dep. 55-56.) Plaintiff did not comply with Defendant's usual and customary notice and procedural requirements for requesting leave, and terminating an employee for a no-call, no-show is a legitimate reason for termination unrelated to any alleged exercise of FMLA rights. *See, e.g., Gilliam v. UPS*, 233 F.3d 969, 971-72 (7th Cir. 2000).

Plaintiff also was terminated for choosing to schedule her wisdom tooth extraction on a workday (Thursday, January 3, 2013), despite the fact that she did not work on Mondays, Tuesdays, and Wednesdays and had been warned just one month earlier that any further absence could result in termination. (Pl. Dep. 31-32, 36, 48-49; Wall Dep. 44-45, 48-57.) Plaintiff had ample opportunities to schedule the extraction for a day when she was not scheduled to work. Dr. McLemore testified that he recommended a wisdom tooth extraction to Plaintiff on November 5, 2012, two months before she underwent the procedure, but it was not an emergency. (McLemore Dep. 9-11, 17.) In addition, Dr. McLemore testified that his office is

open every Tuesday and Wednesday, and every other Monday, and that he performs wisdom tooth extractions every day he is open. (McLemore Dep. 19-20.) Finally, he testified that the wait for a wisdom tooth extraction varies from that same day to at most two weeks. (McLemore Dep. 20-21.) So, Plaintiff had numerous days when she was not scheduled to work on which she could have scheduled the extraction, both before and after January 3, 2013.

Moreover, Plaintiff, a Registered Nurse, knew she would be unable to work on Thursday, January 3, 2013 after undergoing the extraction. Dr. McLemore testified that "as a rule" he advises patients there is a possibility they will not be able to work the day of the procedure and that they need to plan on taking the day off (or potentially more time off than that), and he has no reason to believe he did not convey his standard advice to Plaintiff. (McLemore Dep. 27-28.) In addition, before the procedure, Plaintiff was informed in writing that the "more common complications" from the procedure included "pain, swelling, bleeding, and dry socket," that the medication may make her drowsy, and that she should not operate a motor vehicle for 24 hours. (McLemore Dep. 22-24, Ex. 1 (DEF 0399).) Even if Plaintiff could have found a way to work without driving on January 3, 2013, a nurse who is bleeding, drowsy, and unable to drive certainly is in no condition to care for patients.

Despite the above, and despite being warned just one month earlier that she could be discharged if she missed another day, Plaintiff displayed remarkable disregard for her employer's interests by scheduling an elective dental procedure on a workday, throwing her employer's schedule off and forcing her employer to scramble to find a replacement nurse. Plaintiff's actions violate the FMLA's requirement that employees act reasonably in scheduling medical treatment. *See, e.g.*, 29 C.F.R. § 825.203 ("If an employee needs leave intermittently or on a reduced leave schedule for planned medical treatment, then the employee must make a reasonable effort to schedule the treatment so as not to disrupt unduly the employer's operations."); 29 C.F.R. §

825.302(e) ("When planning medical treatment, the employee must consult with the employer and make a reasonable effort to schedule the treatment so as not to disrupt unduly the employer's operations, subject to the approval of the health care provider. Employees are ordinarily expected to consult with their employers prior to the scheduling of treatment in order to work out a treatment schedule which best suits the needs of both the employer and the employee.").

In December 2012, when providing Plaintiff with her written warning, Ms. Wall informed Plaintiff that she was going to be terminated the next time she called in and could not work. (Wall Dep. 55.) Instead of heeding this warning, Plaintiff scheduled an elective procedure on a work day, and then, unsurprisingly, was unable to come to work that day because she was experiencing the very things she had been warned about before the procedure. This led to Plaintiff exceeding the number of absences allowed by the Hospital in a 12-month period. (Wall Dep. 48-57.) Plaintiff's action, in direct contravention of Ms. Wall's warning, is a legitimate basis to terminate Plaintiff that is unrelated to any alleged exercise of FMLA rights. Plaintiff's FMLA interference claim fails for this reason as well.

## V. CONCLUSION

Plaintiff did not suffer from a serious health condition under the FMLA because she underwent a routine dental procedure with no complications, as confirmed under oath by her dentist, and she was not incapacitated for four consecutive, full calendar days. Second, Plaintiff did not request FMLA leave and did not provide the Hospital with sufficient information for the Hospital to reasonably conclude that she had a serious health condition. Finally, Plaintiff flagrantly defied her employer by scheduling an elective procedure on a workday and failed to call into work on another absence, which gave Defendant legitimate and legal grounds to terminate Plaintiff. For the reasons set forth herein, Defendant's Motion for Summary Judgment should be granted and Plaintiff's lawsuit dismissed in its entirety, with prejudice.

Respectfully submitted,

BRADLEY ARANT BOULT CUMMINGS LLP

By: _s/ J. Craig Oliver_
      Charles J. Mataya (No. 12710)
      J. Craig Oliver (No. 16838)
      John P. Rodgers (No. 30324)
      P.O. Box 340025
      Nashville, Tennessee 37203
      Phone: (615) 244-2582
      Facsimile: (615) 252-6310
      cmataya@babc.com
      coliver@babc.com
      jrodgers@babc.com

      *Attorneys for Defendant, Jackson, Tennessee Hospital Company, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing is being forwarded via the Court's Electronic Case Filing system to:

William Lewis Jenkins, Jr.
WILKERSON GAULDIN HAYES JENKINS & DEDMON
112 West Court Street, P.O. Box 220
Dyersburg, TN 38025-0220

on this the 17th day of November, 2014.

      _s/ J. Craig Oliver_
      J. Craig Oliver